Delmar Investment Co. v. Blumenfield.

DELMAR INVESTMENT COMPANY, Respondent,
v. BLUMENFIELD et al., Appellants.

St. Louis Court of Appeals, April 24, 1906.

1. **LANDLORD AND TENANT: Constructive Eviction.** A constructive eviction by the landlord of his tenant which would warrant the latter in abandoning the premises and refusing to pay rent, must be some act of a permanent character on the part of the landlord which would render the premises untenantable for the purposes for which they were leased.

2. ———: ———: **Breach of Covenant.** Whether the breach of a covenant in a lease on the part of the landord, in the absence of a provision that it should have that effect, would amount to an eviction, would depend upon the magnitude of the breach and the extent of the injury to the lessee in the way of destroying his use of the leasehold.

3. ———: ———: ———: **Elevator Service.** Where a lease of upper floors provided for elevator service furnished by the landlord, frequent but not continuous irregularity and inadequacy of elevator service, when the premises were accessible by stairways, was not such a breach of the covenant as to amount to an eviction.

4. ———: ———: ———: **Waiver.** Where a tenant claimed a violation of a covenant in his lease providing that the landlord should not rent a portion of the same premises to a competing business, he waived the point by demanding a restoration of his rights, with which demand the landlord attempted to comply, so that he could not on that ground defeat an action for rent.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan*, Judge.

AFFIRMED.

*Lee Sale* and *David Goldsmith* for appellants.

(1) The use made by the Feldman Pants Manufacturing Company of the premises from May, 1904, until after July 12, 1904, on which day defendants vacated

the premises, was a breach of the lessor's covenant not to lease or allow any portion of the premises not in possession of defendants to be used for manufacturing or the sale of clothing, and constituted a constructive eviction as a matter of law. Wheeler v. Earle, 5 Cush. 31; Miller v. Prescott, 163 Mass. 12; Ex. parte Eyston, 7 Law Rep. (Ch. Div.) 145; Roffey v. Bent, 3 L. R. Eq. Cas. 758; Warberton v. Wood, 6 Mo. 8; Commonwealth v. Curtis, 9 Allen (Mass.) 266. (2) The failure of the plaintiff to furnish first-class passenger elevator service between the hours of 7 a. m. and 6:30 p. m. was a breach of a covenant of the lease and constituted an eviction. Jackson v. Eddy, 12 Mo. 209; Duff v. Hart, 16 N. Y. S. 163; Herpolsheimer v. Funke, 95 N. W. 668; Hoveler v. Flemming, 91 Pa. St. 222; Hotel Co. v. Philbin, 96 Md. 487; Butler v. Newhouse, 85 N. Y. S. 373.

*Kinealy & Kinealy* for respondent.

(1) There is no evidence of any eviction in this case, because an eviction, actual or constructive, must be some act or conduct which interferes materially with the enjoyment of the physical possession of the premises. 18 Am. and Eng. Ency. of Law, p. 298; Barrett v. Boddie, 158 Ill. 479; Meeker v. Spalsbury, 66 N. J. L. 60.; Talbot v. English, 156 Ind. 299; Gray v. Gaff, 8 Mo. App. 329; Jackson v. Eddy, 12 Mo. 209. (2) There was no constructive eviction shown by reason of the alleged competitive use of a portion of the fourth floor by the Feldman Pants Manufacturing Company. Wright v. Lattin, 38 Ill. 293; Doty v. Lawson, 14 Fed. Rep. 892; Thurman v. Adams, 82 Miss. 204; Behen v. St. Louis Transit Co., 186 Mo. 430. (3) The evidence as to the elevator service did not tend to establish any constructive eviction. Ethridge v. Osborn, 12 Wend, 529; Koehler v. Schneider, 11 N. Y. St. 676; Seaboard R. So. v. Fuller, 67 N. Y. Supp. 146; Orcutt v. Isham, 70 Ill. App. 102; 1 Taylor's Landl. and Ten., sec. 379; Bales

v. Roberts, 189 Mo. 49; Lavin v. Grand Lodge, 86 S. W. 600. (4) Appellants cannot complain of any conflict in instructions, if any there be, caused by their own erroneous instructions. Francis v. Railroad, 127 Mo. 658, 28 S. W. 842, 30 S. W. 129; Reardon v. Railway, 114 Mo. 384, 21 S. W. 731; Summers v. Insurance Co., 90 Mo. App. 691. The judgment being the only one which could be sustained in the case, the instructions are immaterial. Jones v. Brownlee, 161 Mo. 258, 61 S. W. 795; Cass Co. v. Bank, 157 Mo. 133, 57 S. W. 736; Bowman v. Lickey, 86 Mo. App. 47; Wagner v. Edison, E. I. Co. 82 Mo. App. 287; Link v. Prufrock, 85 Mo. App. 618.

GOODE, J. — This is an action for an installment of rent due January 1, 1905, for the use by appellants as tenants of the second and third stories of a building in the city of St. Louis, designated as Nos. 1819 and 1821 Washington avenue. The demand was filed with a justice of the peace and an appeal taken to the circuit court where, on a trial anew, judgment was given for respondent and appellants appealed to this court. Respondent is an incorporated company and at present the owner of the building in which are the leased stories. When the lease was executed the building was owned by Alexander Frankenthal, who afterwards conveyed it to the Frankenthal Investment Company, which company, on April 21, 1903, sold and conveyed it to the Delmar Investment Company. The lease passed by assignment to the latter company. The letting was by a written instrument executed March 31, 1900, by Alexander Frankenthal to appellants, who are partners constituting the firm of Martin Blumenfeld & Bros. The term created was for five years to begin June 1, 1900, and end June 1, 1905, and the rent was $3,400 a year, or $283.33 a month, to be paid on the first day of each month of the term.

Besides other covenants the instrument contained these:

"Lessor hereby agrees to furnish to said lessees access to their said floors by means of a modern, first-class passenger elevator, to be operated by the lessor from 7 a. m. to 6:30 p. m., and staircases to be reached through a vestibule entrance on Washington avenue as per sketch submitted to lessees and approved by them, and also the use of a freight elevator in the rear of said building, and access to the same from the alley entrance; said elevator to be used jointly with other tenants occupying the upper part of said building; also steam heat during the year when it is necessary to make said premises comfortable for occupancy.

"It is agreed, however, between the parties hereto, that if at any time during the term of this lease, any accident shall happen to the machinery in said building, lessor shall not be liable for damages on said account, if he shall forthwith have said machinery repaired so as to comply with his obligations to furnish heat and power as herein provided.

"The said premises shall be used by the said lessees exclusively for the purpose of manufacturing and the sale of clothing at wholesale, and the lessor binds himself not to lease or allow any other portion of the premises during the continuance of this lease, not in possession of the lessees, to be used for manufacturing or sale of clothing."

At the trial in the circuit court the attorney for appellants, on being called on by the court to know what the defense was, stated that it was an eviction and that to establish the eviction appellants relied on the failure of respondent to furnish the passenger elevator service required by the lease, and also a constructive eviction by allowing a concern to occupy part of the building for the purpose of manufacturing and selling pants, in violation of the covenant not to lease or allow any

portion of the premises not held by appellants to be leased during their term for use in the manufacture and sale of clothing.

The testimony introduced regarding the sufficiency of the passenger elevator service was of a highly contradictory character. Appellants and their witnesses swore the service was very poor; that the elevator was often shut down on Saturday afternoons and closed before 6:30 o'clock in the evening of other days of the week; that the operators in charge of the elevator were negligent, did not respond to calls, forcing appellants and their customers to wait a considerable time or climb the stairs, and that generally the service was slow and unsatisfactory, entailing trouble on appellants and perhaps some loss. For respondent the testimony went to show that the service was reasonably good and about as efficient as in most other business houses in St. Louis; that there was prompt attention to calls, except now and then when an inefficient operator was in charge and that when complaint was made of bad service, the operator was promptly changed. For respondent, too, the testimony tended to prove the elevator was kept in operation continuously during the hours stipulated in the lease, except for a brief while now and then when repairs were made. The other tenants in the building testified in support of the contention that the elevator service was good. Letters which had been written by appellants were introduced. They contained complaints, principally regarding the elevator service, but to some extent about the stairway being obstructed with brooms, mops and buckets, and also about the inadequate heating of the building. These complaints began early in the tenancy of appellants, before respondent owned the building, and continued until appellants vacated it in July, 1904. Another tenant was Walter Baach, who occupied the fourth floor. In May, 1904, this tenant sublet a portion of his floor to a concern known as the Feldman Pants Manu-

facturing Company.    Baach's testimony was that he applied to C. A. Tilles, vice-president of the Delmar Investment Company, for permission to make the sublease and Tilles said he had no objection, provided appellants did not object.    Baach said he spoke to one of more of the appellants about the matter and they agreed that he might let to the Feldman Company.    Appellants contradicted this and introduced written remonstrances about the matter addressed to respondent, asserting that the manufacture of pants by the Feldman Company was a violation of the lease and demanding of respondent to put a stop to the violation.    The outcome of the dispute was that an injunction suit was instituted by respondent against the Feldman Company to prevent the use of the premises for the manufacture of pants and the Feldman Company was ousted.    It was engaged in manufacturing pants on the premises from the latter part of May, 1904, perhaps until appellants vacated; but meanwhile the suit against them had been instituted and they quickly left.    Respondent endeavored to oust the Feldman Company in compliance with letters written by appellants, demanding that their rights under the lease be restored.    There were seven of these letters ranging in date from May 25th to June 9th.    In the first one appellants declared that in consequence of the breach of the lease by permitting a competitor to do business in the building, they would not regard themselves as bound to continue in possession or pay rent after the end of May. In the other letters they asked for a restitution of rights under the lease.    Testimony was introduced going to show that appellants had an opportunity to sublet the third floor of the building and in fact made an informal contract to that effect, but the expected lessee refused to take the place on learning of the tenancy of the Feldman Company, because his business would be competitive with said company's.    Evidence was given that appellants had obtained a factory in New York and moved

most of their goods there and for this reason had no further use for the leased premises, desired an opportunity to get rid of them and used their grievances of poor elevator service and the presence of the Feldman Company, for that purpose. It was in proof, too, that they endeavored to induce respondent to accept a surrender of their term, stating as a reason that they intended to discontinue manufacturing in St. Louis on account of trouble with trade unions. This evidence was contradicted by appellants, who testified that after they obtained their New York factory they had no use for the third floor, but needed the second. On July 12, 1904, appellants sent the following letter to respondent:

"Delmar Investment Company, and C. A. Tilles, Vice-president, City.

"Gentlemen: You are hereby notified that the undersigned have this day abandoned the second and third floors of the building known as Commercial Building, heretofore held by them as tenants under you, and have elected to treat the lease under which they came into possession as broken by your permitting a competing line of business to be conducted on the fourth floor, and against our repeated protests, whereby our quiet enjoyment of the premises has been disturbed and the value diminished, to amount to an eviction, and also for the failure to give us access to elevator service in said building. The keys of the premises are herewith returned.

"Yours truly,

"MARTIN BLUMENFIELD & BROS., "Per. J. B."

A letter somewhat similar to that one and complaining of the elevator service, had been sent a year before. It contained an offer to surrender the premises September 1, 1903, or sooner, and stated that appellants were unable to submit to further annoyance. This letter was not followed by decisive action, but the one written July 12th was. Respondent refused to accept a surrender of the term and the next day, July 13th, returned the keys

Delmar Investment Co. v. Blumenfield.

to appellants with a letter stating that respondent had lived up to all the conditions of the lease and expected appellants to do likewise. With affairs in this posture the present action was instituted.

Appellants insist that the declarations of law given by the court were inconsistent and those given at the instance of respondent erroneous. This proposition may be tenable; but we shall not examine the declarations of law, because we are convinced there is no defense to the action and that the judgment was for the right party. Nothing resembling an eviction of the appellants from the premises was proved, nor was any evidence introduced even tending to prove an eviction occurred. No doubt the evidence for appellants, if believed, would establish a breach of the covenants in the lease regarding elevator service and the letting of another part of the building for a competitive business. It is not contended that there was an actual eviction from any part of the leased premises. The contention preferred is that respondent failed to furnish proper elevator service and permitted a subletting of part of the fourth floor, to be used for the manufacture of pants, which breaches amounted to a constructive eviction of appellants. We shall not undertake to define, in terms generally applicable, what constitutes an eviction, for jurists of great knowledge and acumen have confessed that to do so is difficult or impossible. Our inquiry will extend no further than is required to determine whether or not the facts given in defense by appellants, constituted an eviction according to the authoritative precedents. A constructive eviction is, properly speaking, no eviction at all in the sense originally attached to that word; that is, as signifying an actual ouster from lands and tenants, either by a stranger to the lease gaining possession on a title superior to the landlord's, or by an expulsion at the hands of the landlord himself. Any violation of the terms of the lease by the landlord which deprives the

tenant of the beneficial use and enjoyment of all or part of the leased premises, amounts to an eviction and will warrant the tenant in abandoning the premises; whereupon he will stand exonerated from liability for rent. This is the doctrine of constructive eviction, which was adopted first in this country in the case of Dyett v. Pendleton, 8 Cow. N. Y. 728. That case was decided by a divided court, the majority making an extreme application of the principles declared; and though those principles probably have not been affected by later adjudications, the decision itself has been criticized and modified, if not overruled. [Etheridge v. Osborn, 12 Wend. 532; Ogilvie v. Hull, 5 Hill. 54.] The doctrine enunciated in Dyett v. Pendleton, and which has spread over the country as a rule of law, is that there need not be a physical entry by the landlord or an actual ouster of the tenant, to constitute an eviction; but if the acts of the landlord in violation of the contract suffice to deprive the tenant of the beneficial enjoyment of the leasehold, the right to rent is lost. This doctrine was said, in the opinion in Dyett v. Pendleton, to be a part of the "universal principle in all cases of contract, that a party who deprives another of the consideration on which his obligation was founded, can never recover damages for its non-fulfillment." The opinion further said that this was the great and fundamental principle which had led the courts to deny to the lessor the right to recover rent, where he had deprived the tenant of the consideration of his covenant by turning him out of the demised premises, and that it was wholly immaterial by what act the loss of consideration was caused. That is to say, it is immaterial whether it was by a physical expulsion from the premises or by a breach of the lease rendering it impossible for the tenant to occupy them for the purpose for which they were leased.

We will consider when the lessor's breach of some covenant in a lease entitles the lessee to abandon the

Delmar Investment Co. v. Blumenfield.

premises and refuse to pay rent. In other words, when a breach by the lessor amounts to what is denominated a constructive eviction. It never has been held that every breach by a landlord of a covenant contained in a lease, which to any degree impairs the tenant's use of the leasehold, is an eviction. The law is the other way. [11 Am. and Eng. Ency. Law (2 Ed.), p. 476; Wright v. Lattin, 38 Ill. 293.] Many breaches fall short of warranting an abandonment by the tenant, who must look to an action on his covenants for damages. Of course, there may be a stipulation in a lease that a breach of any of its terms by the landlord shall exonerate the tenant from payment of rent, or that the breach of a designated term shall have that effect. In those instances the landlord will be bound by the stipulation and a violation of any covenant, or of one particularly designated, will work a forfeiture of the rent, because the parties agreed that it should. The present lease contains no such proviso and the appellants must depend, not on an express stipulation excusing them from the payment of rent, but on the proposition that the law excuses them because they have been constructively evicted. In Upton v. Townsend, 17 C. B. 51, the opinion said that though an eviction no longer signifies an actual expulsion from the premises, it is something more than a trespass by the lessor on the tenant's right; is "something of a grave and permanent character, done with the intention of depriving the tenant of the beneficial use of the demised premises." This statement of the rule is adopted in the text of 11 Am. and Eng. Ency. Law (2 Ed.), pp. 458 and 461. Numerous cases are cited in the notes in support of the text. On page 463 of that work it is said an express intention of that sort need not be proved, but if the landlord does acts the natural and probable consequence of which are to force the tenant to quit the premises, they will constitute an eviction. If a purpose to encroach on a tenant's enjoyment is essential to an eviction, ap-

pellants plainly have no defense; for the entire record repels the thought of that motive on the part of respondent. If no express purpose to deprive the tenant of his holding is proved, whether or not the lessor's breach worked a constructive eviction, must depend on its effect on the tenant's rights under the lease; that is to say, on the extent to which it deprived him of the use of the premises. A leading text-writer, after discussing this subject and reviewing the authorities, thus states the rule and its reason: "Where the landlord, without turning the tenant out of possession, commits unlawful and wrongful acts which deprive the tenant of the beneficial use and enjoyment of the property, and the tenant in consequence surrenders possession of the premises, such wrongful acts amount, in law, to a constructive eviction. . . . The reason of the rule is that the tenant has been deprived of the enjoyment of the demised premises by the wrongful act of the landlord; and thus the consideration of his agreement to pay rent has failed." [2 McAdam, L. & T., sec. 404.] In another section (407) of the same treatise, various decisions dealing with particular breaches and holding that some amounted to an eviction and others did not, are collected. In another work the rule is thus stated:

"An eviction is not necessarily an actual, forcible taking possession of the demised premises by the landlord, nor does it necessarily consist in the expulsion of the tenant or a physical interference with the demised premises; nor need it be attended with a denial or refusal to permit the tenant longer to occupy the premises under the lease. Any intentional and injurious interference by the landlord or those acting under his authority, which deprives the tenant of the means or the power of beneficial enjoyment of the demised premises or any part thereof, or materially impairs such beneficial enjoyment, is a constructive eviction." [11 Am. and Eng. Ency. Law (2 Ed.), p. 471.]

We take the effect of the authorities to be that to constitute an eviction by construction of law, the wrongful conduct of the landlord must be sufficient to render the premises untenantable for the purpose for which the tenant leased them, or at least seriously interfere with their profitable use.

In Jackson v. Eddy, 12 Mo. 207, it appeared that the landlord occupied the floor above the one leased and permitted tar and other liquids to drop through the upper floor on the tenant's premises below, to his great annoyance. An instruction left it to the jury to say whether or not this leakage on the floor below rendered the room unfit for use as a store, with directions that if it did, and, thereupon, after remonstrance, the defendant abandoned the premises, the plaintiff could not recover the rent. This instruction was approved. The decision adopted the rule declared in Dyett v. Pendleton, that any act of the lessor which defeats the enjoyment of the property by the lessee is good ground for refusing to pay rent, provided the tenant abandons the premises.

In Gray v. Gaff, 8 Mo. App. 329, the facts showed a lease of a certain building for use as a stable and a subsequent lease of the adjoining premises for a restaurant; which business the first lessee claimed would render his premises untenantable on account of heat, smoke and fumes proceeding from the restaurant and affecting the horses in the stable. For this reason the first lessee refused to pay rent and an action was instituted to recover it. After considering the decision in Jackson v. Eddy, 12 Mo. 209, the court said that it must have been put on the ground that the acts of the landlord amounted to a declaration that the tenant or tenants should no longer retain possession. It was said further, that the mere leasing of premises for any business incompatible with the convenient occupation of an adjoining leasehold, does not amount to an eviction of the tenant from the latter, nor relieve him from his obligation to pay rent, unless there was a stipulation to that effect in his

lease. In various cases a failure of the landlord to heat the premises as he had covenanted to do, or the maintaining of an obnoxious sewer which rendered the occupation of the leased premises insupportable, was held to be an eviction. In a text-bok the law is stated as follows: "The rule is that while an eviction was originally a dispossession of the tenant by some act of his landlord, or by failure of the latter's title, it has now come to include any wrongful act of the landlord, either of commission or omission, which may result in a substantial interference with the tenant's possession or enjoyment, in whole or in part." [1 Taylor, L. & T., sec. 309a.] In the same work it is said that in order to constitute an eviction, the landlord must do something of a permanent character to deprive and which does deprive, the tenant of the use of the demised premises or some part thereof; as where the tenant is denied access to the premises. [1 Taylor, L. & T., sec. 309, citing Meeker v. Spalsbury, 66 N. J. L. 60; Grove v. Youell, 110 Mich. 285.] It has been held that a landlord's breach of a covenant to perform certain services for the tenant in the way of furnishing supplies and machinery, is not an eviction. [Bean v. Fitzpatrick, 67 N. H. 225.]

In Duff v. Hart, 16 N. Y. Supp. 163, where evidence had been received without objection, tending to prove that the occupation of the lower story of a building by a laundry deprived a lessee, holding under a prior lease, of the use of the upper story for a floral establishment, it was held proper for the jury to say whether or not there had been an eviction from the latter. From the tenor of the opinion it looks like the court questioned the compentency of the evidence on the pleadings; but as it went to show the floral business could not be conducted over a laundry, and had been received without objection as tending to prove an eviction, it was proper to submit the question of whether it did or not to the jury.

In Wright v. Lattin, 38 Ill. 293, it was said that the act of a landlord in violation of his lease, which would discharge the tenant of liability to pay rent, must be such as would render the lease unavailing to the tenant.

So it has been held that possession by a tenant after a breach of a covenant by a landlord was a waiver of the right of abandonment. [Barrett v. Boddy, 158 Ill. 479; Seaboard R. E. Co. v. Fuller, 67 N. Y. Supp. 146.] This rule could hardly be applicable to the instance of a breach of some covenant which ought to be continually performed, and ought not to estop appellants from relying on the alleged bad elevator service.

About the only conclusion to be deduced with certainty from the authorities on this subject is that, when a constructive eviction is asserted because of breaches of covenants by the lessor, the magnitude of the breach and the extent of the injury done to the lessee in the way of destroying his use of the leasehold, are decisive of whether or not an eviction occurred. Those elements of the case are to be weighed with reference to their effect on the consideration which moved the tenant to lease the premises. And though no hard-and-fast rule, which will fit the facts of every case, can be stated with precision, as said above, the use of the leasehold for the purpose intended by the lessee must be impaired materially by the breach.

Now let us look at the facts of the present case in the light of the foregoing authorities. If the elevator service was inadequate, this fact did not amount to an eviction. It but slightly hindered the beneficial use of appellants' floors, which were the second and third and easily accessible by the stairway, and had little or no effect on their business. At the most, the breach entailed a trifling loss and some inconvenience; both easily compensated in damages. Appellants submitted to it for years and certainly did not regard it as depriving them of the consideration which had induced them to

118 App—21

agree to pay rent for the premises. The irregularity of the service may have been frequent, but it was not continuous; for there is no doubt that appellants and their patrons used the elevator practically every time they wished to enter or leave the premises. Such a breach is not a sufficient deprivation of a tenant's right to exonerate him from paying rent.

The uncontradicted evidence shows that respondent only consented to the subletting to the Feldman Company in the belief that it was agreeable to appellants; and as soon as the contrary appeared, steps were taken to end the Feldman Company's occupancy and it was soon ousted from the building. Without deciding that this letting amounted, in the circumstances shown, to a breach of covenant by the lessor, or to such a breach as gave appellants the right to abandon their lease, we hold they waived the right if it accrued to them. In the first protest addressed to respondent on May 25th, they elected to abandon; declaring they would not regard themselves as obliged to continue in possession or pay rent after the end of the month. This notification was repeated on May 31st; but on June 3rd another letter was written in which appellants said: "We now demand to know by return mail whether you [respondent] intend to restore us to our rights under the lease or not. We are entitled to this information from you and unless we get it by return mail, shall conclude that you intend to do nothing in the premises and to ignore this breach of your contract." This was a different position from the one first taken and imported no election to abandon, but that, on a cessation of the breach, appellants would continue their tenancy. A correspondence and some interviews followed, in which respondent asserted that the subletting was permitted on Baach's representation that appellants had consented to it, and appellants denied Baach's statement. In June the injunction case was instituted to stop the Feldman competition, and while it

was pending appellants vacated.  Now when appellants called for a restoration of their rights, they impliedly gave respondent a reasonable time to bring about the restoration, and the duty then incumbent on respondent was to act promptly in the matter.  This was done, and the abandonment by appellants while measures were in progress to redress their grievance, must be regarded as arbitrary and unjustifiable.

The judgment is affirmed.  All concur.